352 So.2d 500 (1976)
LaFrench HOPSON
v.
STATE.
7 Div. 492.
Court of Criminal Appeals of Alabama.
December 7, 1976.
Rehearing Denied January 4, 1977.
*501 H. Wayne Love and James D. Sloan, Anniston, for appellant.
William J. Baxley, Atty. Gen., and Eric A. Bowen, Asst. Atty. Gen., for the State.
HARRIS, Judge.
Appellant was convicted of murder in the second degree and the jury fixed his punishment at 20 years imprisonment in the penitentiary. He was represented by court-appointed counsel at arraignment and trial. He pleaded not guilty and not guilty by reason of insanity. After conviction appellant gave notice of appeal and was furnished a free transcript. Trial counsel was appointed to represent him on this appeal.
Appellant was indicted on February 9, 1971, for murder in the first degree involving the death of his uncle, LaFrench Hughley, by shooting him with a gun. The evidence surrounding the killing was circumstantial. Appellant did not testify, and no testimony was offered in his behalf.
At the conclusion of the State's case appellant made the following motion:
"MR. LOVE: Your Honor, we move to exclude the State's evidence on the basis that they have failed to prove the corpus delicti. They have failed to prove that the man died of any criminal act. The indictment says that he was killed by a shot with a rifle, and they have failed to prove that. They have failed to prove that, even if he was shot with a rifle, he died from that. They have failed to prove that, even if he died by a gunshot wound, that it was a shot fired by the defendant. They have failed to prove that it was intentional, premeditated, and deliberate."
This motion was overruled but it puts us to a recital of the evidence, which is most favorable to the State.
Dan Hughley, Jr., a brother of the deceased and an uncle of appellant, testified that he was 71 years of age and that his brother was 40 years of age at the time of his death on the 28th day of August, 1970. He stated that his brother and appellant were living in the same house located at 1020 Parkwood Drive, Anniston, Alabama, on August 28, 1970. He said the last time he saw his brother alive was on the morning of August 28, and the next time he saw him was on the afternoon of the same day when the Rescue Squad was taking him out of the house on a stretcher.
This witness further testified that on the afternoon of August 28, appellant drove to his home on Sidney Street and told him that he had killed the, _______ _______ _______ _______, referring to the deceased. He stated that appellant was driving a blue Buick automobile and that he saw a rifle that belonged to his father in appellant's automobile. He said that after appellant told him he had killed the deceased, he drove off at a fast rate of speed. He further stated that he was in such shock that he was unable to move until someone offered to carry him to his brother's house. When he arrived at his brother's home, he saw him on the stretcher and he was very bloody. He entered the house and found his brother's brains scattered all over the floor in the bedroom. He saw bullet holes in the window of the bedroom and a number of bullet *502 holes in the door to the bedroom. He further testified that he saw blood and brains in his brother's bedroom but he did not see any weapons of any kindguns, knives, rifles, axes, hatchets, picks, etc.
Dan Hughley, Jr., further stated that he saw his brother the next day at the funeral home and he was dead. That the next time he saw appellant was on the day of the trial of appellant for murder on June 16, 1976.
Magnolia Mitchell testified that she lived at 1008 Parkwood Drive which was directly across the street from the house where appellant and the deceased lived. She stated she saw appellant on the afternoon of the killing, between 1:00 and 1:30 o'clock. That she was sitting on the porch of her home and saw appellant drive to the home where he had been living with the deceased. She saw him enter the house and after a few minutes he came out with a rifle or gun in his hand and got in his car and left. After appellant left, the deceased came home and entered his house. About an hour or so later appellant came back to the house. He jumped out of his car, ran upon the porch and started shooting at the window and also the door. She heard glass breaking. She then saw appellant run around to the rear of the house and she heard a noise, like somebody breaking in the back door and saw that door open.
She further testified that she had known the deceased for a long time and had talked to him almost every day. She stated that she was familiar with his voice. She said that when appellant broke into the back door, she heard the deceased say, "Please, Bill, don't. Please, Bill, don't," and she heard more shots, after which appellant got in his car and left. He carried the rifle with him. Appellant was also called "Bill" by the people who knew him. That was his nickname. She then ran to the home of her next door neighbor.
She further stated she saw the Rescue Squad carrying the deceased out of the house on a stretcher. She also saw the brother of the deceased when he came to the house and went inside.
This witness further said that she next saw appellant later that afternoon. He was walking and was carrying the gun with him; that a number of people were at the house when appellant walked up and asked for his clothes. Most of the people present jumped up and ran but someone went in the house and returned with some clothes and put them on the porch. Appellant walked to the porch and picked up the clothes and walked up the street.
On cross-examination this witness testified that in her best judgment appellant fired four to six to ten shots before he got in his car and fled from the scene. She stated she saw appellant shoot through the door and through the window.
Dorothy Minnifield testified that on August 28, 1970, she lived with her husband and family at 1010 Parkwood Drive; that she knew the deceased in his lifetime but she did not see him on the day he was killed. She stated she was sitting on her porch on August 28, and saw appellant drive his blue Buick automobile to the house of the deceased. That she observed him stop his car and reach back and get a rifle. He got out of his car and walked up on the porch where he and the deceased lived. She saw him fire one shot and she ran to the Turner house a short distance away. While standing on the porch of the Turner house, she saw appellant come out of the Hughley house with the gun in his hand. He got in his car and left the premises and she did not see appellant again until the day of his trial. She identified him in the courtroom as being the same man who fired the shot in the deceased's home on the day he was killed.
Circumstantial evidence may afford satisfactory proof of the corpus delicti in a murder prosecution, and, if facts are presented from which the jury may reasonably infer the crime has been committed, the question must be submitted to the jury, and other evidence tending to implicate the defendant is thereby rendered admissible. Johnson v. State, 247 Ala. 271, 24 So.2d 17; Phillips v. State, 248 Ala. 510, 28 So.2d 542; DeSilvey v. State, 245 Ala. 163, 16 So.2d *503 183; Harnage v. State, 49 Ala.App. 563, 274 So.2d 333; Cronnon v. State, 56 Ala.App. 192, 320 So.2d 697.
This is one of the strongest cases of circumstantial evidence to reach this Court in a long time. Moreover, a few minutes after the fatal shooting appellant drove to the home of the brother of deceased and told him that he had killed LaFrench Hughley and soon thereafter he fled from the state of Alabama.
Prior to entering into the trial of this case appellant filed a motion to dismiss the indictment on the ground he was denied a speedy trial. After a lengthy hearing this motion was denied. Appellant then filed a motion for a change of venue alleging that he could not get a fair trial in Calhoun County because of widespread publicity relative to the case. Testimony was heard on this motion and the Court denied this motion also.
It was developed on this hearing that appellant left Alabama after killing his uncle and went to the state of New York. Shortly after arriving in New York, he committed another homicide resulting in a conviction for manslaughter in the first degree for which he was sentenced to eight years in Attica State Prison. He testified that while serving the eight-year sentence in Attica, he learned that he had been indicted for murder in the first degree in Calhoun County, Alabama, involving the death of his uncle, LaFrench Hughley. He further stated that on August 20, 1973, he communicated with the Alabama authorities requesting that he be returned to Alabama to answer the charges pending against him. He said he did not receive a reply to this request. Later he solicited the aid of the Legal Aid Bureau of Buffalo, New York.
On August 22, 1974, a letter was sent to the Calhoun County Court by an attorney for Hopson, stating he was enclosing a motion for a speedy trial for Hopson who was presently incarcerated in Attica Correctional Facility. This letter made inquiry as to the status of the case against Hopson for which a warrant was being held against him at Attica. This letter was followed by another letter from a different attorney on September 19, 1974, seeking the status of the case against Hopson. This letter was also sent to the Calhoun County Court. This last letter was answered by the Clerk of the Circuit Court of Calhoun County advising the writer that the Grand Jury of Calhoun County indicted Hopson for murder in the first degree on February 9, 1971, but that the defendant had not been arrested.
Alabama had filed a detainer for Hopson with the proper authorities in New York. On November 12, 1974, the County Judge of Wyoming County dismissed the warrant for Hopson's arrest without prejudice to any subsequent extradition proceedings by the State of Alabama.
In the meantime the authorities in Alabama had been trying to locate Hopson. On September 10, 1970, the District Attorney of Calhoun County wrote a letter to the United States District Attorney in Birmingham enclosing copy of the murder warrant against him and giving a description of the defendant. The purpose of this letter was to request the United States District Attorney to issue a complaint or warrant against Hopson for Unlawful Flight to Avoid Prosecution and if he was taken into custody, Alabama would seek to extradite him and prosecute him.
The secretary to the United States District Attorney wrote a letter to the County Sheriff in Buffalo, New York, on August 3, 1971, to ascertain if Hopson was in jail there and if he would waive extradition to Alabama to answer the charge pending against him in Calhoun County. The secretary received a letter from the Assistant Superintendent of the Erie County Jail on August 9, 1971, advising her that Hopson was in custody there on a charge of first degree murder and a detainer would be lodged against him. This letter went on to say that if Hopson was sentenced to another institution on the charge pending against him, the detainer from Alabama would be sent to that institution.
*504 On October 19, 1971, the Superintendent of Attica Correctional Facility, wrote a letter to the prosecuting attorney of Calhoun County, Alabama, advising him that he would be notified in sufficient time prior to the release of Hopson so that he could be taken into custody.
On June 18, 1974, extradition proceedings were begun by the District Attorney of Calhoun County by filing an application for extradition with the Governor of Alabama for a requisition to the Governor of New York. The proper requisition papers were forwarded by the Legal Adviser to Governor Wallace to Governor Nelson A. Rockefeller on June 25, 1974.
On July 16, 1974, Counsel for Governor Rockefeller advised the Legal Adviser to Governor Wallace that Hopson had been convicted of first degree manslaughter in Erie County, New York and sentenced to the Attica Correctional Facility for eight years. He further stated that "the date of conditional discharge for Mr. Hopson is April 9, 1976," and "In view of the long delay before subject will be available to answer a fugitive warrant, Governor Wallace's requisition is being returned to you."
Following receipt of the above letter Governor Wallace's Recording Secretary sent a copy of this letter to the District Attorney of Calhoun County and suggested that he might wish to place a holdover for this fugitive or enter into an Executive Agreement to return Hopson to Alabama for trial and then return him to New York.
On August 9, 1974, the District Attorney of Calhoun County, Alabama, wrote a letter to Counsel for Governor Rockefeller to please place a hold on Hopson at Attica Correctional Facility and advise him 60 days prior to his release. On August 15, 1974, Counsel for Governor Rockefeller wrote the District Attorney and advised him that his letter of August 9, 1974, had been referred to "Mr. Eugene Phillips, Supervisor of Inmate Classification and Movement, Department of Correctional Services, State Campus, Albany, New York."
This was the last communication from New York to the authorities in Alabama relative to the return of Hopson to Alabama to stand trial for murder in the first degree.
Appellant testified that he was released from the New York prison on April 9, 1976 and he returned to Alabama where he was arrested. New York did not honor the District Attorney's request that he be notified 60 days prior to Hopson's release date so that new steps could be taken to extradite him or otherwise gain custody of him. When appellant returned to Alabama, he did not surrender to the authorities and demand a speedy trial. He simply did not want a trial at all.
At the conclusion of the hearing on the motion to dismiss the indictment the Court made the following observations:
"THE COURT: Well, the Prince case, as I understand it, involved this, more or less, an annual exchange of letters between the District Attorney in Birmingham and the California authorities, in which the District Attorney more or less stated `We still want Prince, have you still got him, we still expect to take charge of him when he has paid his debt to California,' so to speak, and that was the substance of these repeated letters over the year. It was never an attempt at extradition. The Hopson case differs from that case in that extradition was actually attempted by the State of Alabama and was refused by the State of New York. Now, the Barker versus Wingo case did not involve moving a prisoner from one state to another, as I understand it. A man was held under threat of trial for more than five years and all within the same state.
"MR. LOVE: That's correct.
"THE COURT: Now, when was Mr. Hopson released fromwhen did he obtain his conditional release from Attica State?
"MR. CAHILL: April the 9th, 1976.
"THE COURT: April the 9, 1976. So actually what we are dealing with is two things: One is the period before, something like before August 20, 1973; and *505 the other is a period from that date up to release date in 1976. My conviction in this matter, based on the facts, is that Mr. Hopson knowledgeable (sic) and intelligently waived his right to a speedy trial up to and including the 20th day of August, 1973. When it began to appear to be to his advantage to demand a speedy trial, he did demand it and thereby withdrew his waiver. And then the next thing is, in view of the confused addresses and other things, whether prompt efforts were made to obtain him. I believe they were. And then the next question is whether, after being refused extradition, the State of Alabama was under a duty to make effort by another letter or go into Federal Court or do anything else. I don't believe they were. The Constitution of the United States says that the various states are under a duty to extradite fugitives from justice in the other states. And extradition, as I understand it, is the highest Constitutional Exercise of the right of one state upon another. Where that is refused I don't feel that the state is under any further duty. I am going to deny the motion and put Mr. Hopson on trial and I believe that the trial date is June the 14th, isn't it?"
In Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, the Supreme Court held there were at least four factors to take into consideration in dealing with speedy trial issues. They are: (1) length of delay, (2) the reason for delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant. In Barker the Supreme Court held that where the defendant was not seriously prejudiced by more than five years delay between arrest and trial his Sixth Amendment right to a speedy trial was not violated.
In this case Alabama made a good faith attempt to gain custody of appellant after he committed the crime and fled the State and as soon as his whereabouts were known. The State of New York systematically thwarted Alabama's efforts to return Hopson to the State to answer the indictment pending against him. There was only a few weeks delay between appellant's arrest and the date of his trial. Appellant did not show that he was prejudiced in any manner either by murky memories of witnesses in his behalf or that he had any witnesses at all whose addresses had become unknown since the date of the crime. We hold that under the facts in this case appellant was not denied his Constitutional right to a speedy trial.
For other cases in which this Court has dealt with speedy trial cases see, Sellers v. State, 48 Ala.App. 178, 263 So.2d 156; Diamond v. State, 49 Ala.App. 68, 268 So.2d 850; Ex parte Collins, 53 Ala.App. 577, 302 So.2d 551; Broadnax v. State, 54 Ala.App. 546, 310 So.2d 265.
A hearing was conducted on appellant's motion for a change of venue. The basis of this motion was a tape recording with the District Attorney concerning appellant's trial for murder which was broadcast over a local radio station three times. There were two broadcasts on June 9, 1976 and one on June 10, 1976. The tape recording is set out in the record and there is nothing of a prejudicial nature in the statement given by the District Attorney to the reporter for the radio station. It merely recites the history of the case relative to the killing of appellant's uncle and the time he spent in prison in New York for an unrelated killing. The broadcast was made five days before appellant's trial. At the conclusion of the hearing the trial judge stated that he would reserve his ruling until the jury was qualified. The record does not reveal that any juror heard any one of three radio broadcasts. The motion for change of venue was overruled and denied.
There was no error in overruling the motion for change of venue. Gilliland v. State, 291 Ala. 89, 277 So.2d 901; Mathis v. State, 52 Ala.App. 668, 296 So.2d 755.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur, except CATES, J., who dissents with an opinion.
*506 CATES, Judge, dissenting.
I must respectfully dissent because I think that the trial court has ignored Prince v. Alabama, 5 Cir., 507 F.2d 693, and Braden v. 30th Judicial Circuit Court, 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443.
Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, a 1972 case, is further explicated in the 1973 opinion, Moore v. Arizona, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183.
To me it is obvious that New York, as early as 1971,[1] had Hopson in custody. Extradition does not require a state to deliver a person convicted in its courts who is then obeying and enduring a sentence. Rather, under Braden, supra, habeas corpus ad prosequendum is the remedy. This was told to the prosecuting attorney by the governor's recording secretary after New York had indicated that the request for extradition was premature.
If Hopson had been in the Alabama penitentiary instead of that of New York the principles of Ex parte State, ex rel. Attorney General, 255 Ala. 443, 52 So.2d 158, would have prevented a waiver until he knew of his indictment.
As I see this situation the burden of persuasion shifted to the prosecution when the then District Attorney apparently ignored the hint as to bringing Hopson back for trial with an executive agreement to return him thereafter to New York to serve the remainder of his New York manslaughter sentence.
Under Mayberry v. State, 51 Ala.App. 343, 285 So.2d 507, I vote to remand for a consideration of the rules laid down in Prince v. Alabama, 5 Cir., 507 F.2d 693. See Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607, Barker, supra, Moore, supra, and Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26.
NOTES
[1] Letter of October 19, 1971, to prosecutor.